[No. E028515. Fourth Dist., Div. Two. Jan 29, 2002.]

CITY OF REDLANDS, Plaintiff and Respondent, v.
COUNTY OF SAN BERNARDINO et al., Defendants and Appellants.

[No. E028540. Fourth Dist., Div. Two. Jan 29, 2002.]

CITY OF RANCHO CUCAMONGA, Plaintiff and Respondent, v.
COUNTY OF SAN BERNARDINO et al., Defendants and Appellants.

**COUNSEL**

Alan K. Marks, County Counsel, and Robin Cochran, Deputy County Counsel, for Defendants and Appellants.

James L. Markman; Richards, Watson & Gershon and Rochelle Browne for Plaintiff and Respondent City of Rancho Cucamonga.

Daniel J. McHugh and Leslie E. Murad II for Plaintiff and Respondent City of Redlands.

OPINION

GAUT, J.—

### 1. *Introduction*

The County of San Bernardino (the County) approved amendments that modified its general plan relating to land use regulation of unincorporated territory located within a city's "sphere of influence." In connection with the approval of these amendments, the County also adopted a negative declaration under the California Environmental Quality Act (CEQA).[1] The City of Rancho Cucamonga and the City of Redlands filed petitions for writ of mandate on the ground that the County failed to comply with CEQA in adopting the amendments by preparing an environmental impact report (EIR). In particular, Rancho Cucamonga and Redlands argued that the County's finding of no significant environmental impacts was based on its inaccurate description of the amendments as mere clarifications of existing language in the general plan. The trial court agreed with the cities, granted the petitions, and issued the writ of mandate to set aside the amendments.

In appealing from the trial court's judgment, the County makes the following arguments: the project description was accurate and, alternatively, even an inaccurate project description would not require the mandatory preparation of an EIR; substantial evidence did not support a fair argument that the amendments may have a significant impact on the environment; and language in the court's injunction precluding the County from adopting any "similar" amendments without preparing an EIR was overbroad.

Rancho Cucamonga argues, and Redlands joins in its argument, that the trial court properly granted the petitions and issued the writ of mandate. We agree and affirm.

### 2. *Factual and Procedural History*

On July 27, 1999, the County Board of Supervisors (the Board), despite objections submitted by a majority of the cities within the county, adopted general plan amendment CW1-849N, also known as the Sphere Amendments (the amendments). The amendments relate to sphere of influence

---

[1]Public Resources Code section 21000 et seq.

areas, which designate the probable physical boundaries and service areas of local agencies.[2] As part of its project description, the County stated that the purpose of the amendments was "to clarify the County's land use planning authority and development approval discretion in sphere of influence areas, as treated in the General Plan text. The wording changes proposed in the amendment are necessary to ensure that policies meant to promote cooperation with cities cannot be interpreted as a forfeiture of the authority of the County Board of Supervisors."

After evaluating the environmental impact of the amendments and considering public comment, the Board adopted a negative declaration. A negative declaration is "a written statement by the lead agency briefly describing the reasons that a proposed project . . . will not have a significant effect on the environment and therefore does not require the preparation of an EIR."[3]

Certain entities, including Rancho Cucamonga and Redlands, filed separate petitions for writ of mandate challenging the Board's decision. In their petitions, Rancho Cucamonga and Redlands claimed that the amendments substantially changed the general plan by eliminating certain requirements, including that development within a city's sphere of influence conform to that city's general plan and zoning laws. Rancho Cucamonga and Redlands claimed that the amendments would allow for development that may have an adverse impact on various environmental factors, including air quality, traffic, and public services. The cities therefore sought a peremptory writ of mandate ordering the County to set aside the amendments and prohibiting the County from adopting any substantially similar amendments before preparing an EIR.

The trial court found that the amendments, instead of clarifying existing policy, substantially changed the County's land use policies pertaining to unincorporated territories within various spheres of influence. The court found that the County failed to gather facts necessary to perform an adequate environmental analysis. The court also found that substantial evidence supported a fair argument that the amendments may have a significant impact on the environment. The court therefore issued the writ of mandate ordering the County to set aside the amendments and prohibiting the County from adopting any similar amendments to the general plan.

---

[2]Government Code section 56076; see also Government Code section 56425.

[3]Guidelines for Implementation of the California Environmental Quality Act, California Code of Regulations, title 14, section 15371. All further references to these regulatory provisions will be to the Guidelines.

### 3. *Standard of Review*

■ A governmental agency must prepare an EIR on any project that may have a significant impact on the environment.[4] If there is no substantial evidence of any significant environmental impact, however, the agency may adopt a negative declaration.[5]

In reviewing an agency's decision to adopt a negative declaration, a trial court applies the "fair argument" test.[6] "Under this test, the agency must prepare an EIR whenever substantial evidence in the record supports a fair argument that a proposed project may have a significant effect on the environment. . . ."[7] If such evidence exists, the court must set aside the agency's decision to adopt a negative declaration as an abuse of discretion in failing to proceed in a manner as required by law.[8]

In reviewing the trial court's judgment on a petition for writ of mandate, we apply the same test.[9] We independently review the administrative record to determine whether the agency failed to proceed in a manner consistent with the requirements of CEQA.[10]

### 4. *Project Description*

■ The County claims the trial court erred in finding the project description inadequate. The County also claims that any inadequacies did not support the court's order to prepare an EIR.

Generally, an agency will prepare an initial threshold study to gather information necessary to determine whether to prepare an EIR or a negative

---

[4]Public Resources Code section 21100; *Pala Band of Mission Indians v. County of San Diego* (1998) 68 Cal.App.4th 556, 570-571 [80 Cal.Rptr.2d 294], quoting *Quail Botanical Gardens Foundation, Inc. v. City of Encinitas* (1994) 29 Cal.App.4th 1597, 1601-1602 [35 Cal.Rptr.2d 470]; *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1399 [43 Cal.Rptr.2d 170].

[5]*Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at page 1399.

[6]*Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at page 1399; see also *Pala Band of Mission Indians v. County of San Diego, supra,* 68 Cal.App.4th at page 571.

[7]*Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at pages 1399-1400.

[8]*Pala Band of Mission Indians v. County of San Diego, supra,* 68 Cal.App.4th at page 571.

[9]*Pala Band of Mission Indians v. County of San Diego, supra,* 68 Cal.App.4th at page 571; *Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at page 1375; see also *Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1259 [100 Cal.Rptr.2d 301].

[10]*Pala Band of Mission Indians v. County of San Diego, supra,* 68 Cal.App.4th at pages 571-572; *Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at pages 1375-1376.

declaration.[11] The initial study must include a description of the project.[12] The study must also "[p]rovide documentation of the factual basis for the finding in a Negative Declaration that a project will not have a significant effect on the environment."[13]

█ The negative declaration is inappropriate where the agency has failed either to provide an accurate project description or to gather information and undertake an adequate environmental analysis.[14] An accurate and complete project description is necessary for an intelligent evaluation of the potential environmental impacts of the agency's action.[15] "Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance."[16]

█ In this case, the initial study characterized the project as an amendment to revise land use policies relating to unincorporated territory within a city's sphere of influence and to clarify the County's authority and discretion relating to land use planning and development. Despite this benign description, the changes themselves reveal far broader consequences.

Rancho Cucamonga and Redlands alleged that, before the 1999 amendment, the County's general plan required that the County conform development within a city's sphere of influence to that city's planning and zoning standards, support annexation of urban areas within a city's sphere of influence to that city, require a conditional use permit for certain development, and implement other policies to ensure these goals. Rancho Cucamonga claimed that the Board's adoption of the amendments eliminated all of these requirements.

The record supports the cities' contention. In adopting the amendments, the Board often replaced mandatory language with more permissive or

---

[11]Guidelines section 15063, subdivision (c)(1); see also *Christward Ministry v. Superior Court* (1986) 184 Cal.App.3d 180, 186 [228 Cal.Rptr. 868].

[12]Guidelines section 15063, subdivision (d)(1).

[13]Guidelines section 15063, subdivision (c)(5).

[14]See *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 311 [248 Cal.Rptr. 352]; *Christward Ministry v. Superior Court, supra,* 184 Cal.App.3d at page 197.

[15]*Silveira v. Las Gallinas Valley Sanitary Dist.* (1997) 54 Cal.App.4th 980, 990 [63 Cal.Rptr.2d 244]; see also *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 730 [32 Cal.Rptr.2d 704]; *McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1143 [249 Cal.Rptr. 439]; *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 193 [139 Cal.Rptr. 396].

[16]*County of Inyo v. City of Los Angeles, supra,* 71 Cal.App.3d at pages 192-193.

discretionary language. For example, one former provision in policy LU-10 stated: "Review the master plans and/or general plans of all agencies and *incorporate* any and all policies that are applicable and appropriate into the County General Plan." The provision now reads: "Review the master plans and/or general plans of affected agencies and *consider* the provisions of those plans in the implementation of the County General Plan."

A former provision contained in policy LU-9 relating to growth control provided: "*Recognize and implement* growth control limits adopted by cities as they apply to spheres." The amended provision states: "*Consider implementation* of growth control limits adopted by cities as they apply to spheres, unless such limits conflict with the goals and policies of the County General Plan."

The amendments entirely eliminated certain provisions containing various requirements or limitations. One such provision originally provided: "Require Conditional Use Permits within city spheres of influence for all development other than single family residences and expansions of existing uses that are less than 25%." From the policies pertaining to the West Valley Foothills planning area, the Board also eliminated the following requirement: "Adopt and implement the slope development guidelines of adjoining communities."

Additionally, the amendments granted the County greater discretion in land use matters relating to unincorporated territory. In determining whether to apply a city's development policies and standards, the Board added the phrase, "as determined based on the goals and policies of the County General Plan." Also, under the heading, "Land Use Planning in the Sphere of Influence . . . Areas," the Board included the following language: "The County possesses final authority to regulate land use within all unincorporated areas, including those areas located in the cities' spheres of influence. However, in order to ensure orderly quality development with adequate public services . . . the County will seek input from a City on the subject of any land use entitlement applied for within [Rancho Cucamonga's] sphere of influence prior to approving any such application."

As argued by the cities, the amendments were more than mere clarifications of existing general plan provisions. By adopting the amendments, the Board made substantive changes to the County's policies and procedures in making land use and development decisions involving unincorporated territory within a city's sphere of influence. In essence, the amendments eliminated the requirement that the County give substantial weight to and even implement the standards provided in an affected city's general plan.

In fact, the Board adopted the amendments in response to Redlands's successful litigation against the County involving a conflict between the County's general plan and Redlands's growth control measures and development standards. Under the new amendments, where a conflict between city and county standards exist, the County has granted itself discretion to override city standards in making decisions concerning land within that city's sphere of influence. It appears that what the County failed to do in court, it attempted to accomplish through quasi-legislative proceedings.

Moreover, the initial threshold study is inadequate because it fails to provide sufficient evidence or analysis of the potential environmental effects of the amendments.[17] "The agency should not be allowed to hide behind its own failure to gather relevant data."[18] Although the amendments essentially indicate a movement away from a city's standards and a movement toward county's exercise of greater discretion, the County does not provide evidence to show how such a shift in policy would have little or no effect on the environment.

In the initial study, although the County checked either the "no impact" or "less than significant impact" options, the County failed to cite any evidence in support of its findings. Instead, under each environmental factor, the County provided the following evaluation with slight variations: "The policy changes proposed in this General Plan Amendment are not expected to result in any significant environmental impacts related to [_____]. The project would revise County polices concerning city spheres of influence and coordination of County planning with other agencies. The revised policies emphasize the primacy of County land use plans and polices over those of any city as long as an area remains unincorporated, under County jurisdiction. No changes are proposed for any goals, policies or action items related to [_____]. This project will have no direct physical impacts on the environment, and the potential differences in future land development would have no significant effect on [_____].

"As an indirect result of this project, more properties may develop under County land use jurisdiction instead of annexing to cities. Remaining unincorporated would not affect existing [_____] . . . ."

The County's response indicates an impermissible attempt to evade environmental review by failing to address the consequences of the revisions to

---

[17]*Sundstrom v. County of Mendocino, supra,* 202 Cal.App.3d at page 311.
[18]*Sundstrom v. County of Mendocino, supra,* 202 Cal.App.3d at page 311.

its policy and procedures. Indeed, the County's efforts can be characterized as "a token observance of regulatory requirements."[19]

Not only does CEQA apply to revisions or amendments to an agency's general plan, but CEQA reaches beyond the mere changes in the language in the agency's policy to the ultimate consequences of such changes to the physical environment.[20] A general plan embodies an agency's fundamental policy decisions to guide virtually all future growth and development.[21] "Even if a general plan amendment is treated merely as a 'first phase' with later developments having separate approvals and environmental assessments, it is apparent that an evaluation of a 'first phase-general plan amendment' must necessarily include a consideration of the larger project, i.e., the future development permitted by the amendment. Only then can the ultimate effect of the amendment upon the physical environment be addressed."[22]

The record indicates that the County has failed to consider such reasonably anticipated future development. In response to specific complaints of segmentation, the County noted: "The proposed Sphere Policy changes do not, in and of themselves, lead to potential significant impacts either directly or ultimately because future projects within the spheres will be evaluated on their own merits based on the issues associated with each individual sphere where the project occurs."

The County's response is again inadequate. On the one hand, the County states that the amendments may result in greater development under the County's jurisdiction without annexation to a city; yet, on the other hand, the County insists that the amendments would have little or no significant effect on the environment. The County apparently anticipates no future development impacting the environment. The record, however, clearly indicates the existence of not only potential future development, but at least one existing project undergoing separate environmental review. Thus, the County has failed to adequately consider future development in making its determination to adopt the negative declaration.

---

[19]*Sundstrom v. County of Mendocino, supra,* 202 Cal.App.3d at page 305.

[20]*Christward Ministry v. Superior Court, supra,* 184 Cal.App.3d at page 194; *City of Livermore v. Local Agency Formation Com.* (1986) 184 Cal.App.3d 531, 539 [230 Cal.Rptr. 867].

[21]*Federation of Hillside & Canyon Associations v. City of Los Angeles, supra,* 83 Cal.App.4th at page 1260.

[22]*Christward Ministry v. Superior Court, supra,* 184 Cal.App.3d at page 194; see also *Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 370-371 [7 Cal.Rptr.2d 307].

CEQA advances a policy of requiring an agency to evaluate the environmental effects of a project at the earliest possible stage in the planning process.[23] We conclude that, by failing to accurately describe the agency action and by deferring full environmental assessment of the consequences of such action, the County has failed to comply with CEQA's policy and requirements.

The County alternatively claims that any inadequacies did not support the court's order to prepare an EIR. Rather, the County argues that the court should have required a revised initial study or reconsideration of the negative declaration.[24] As discussed in the next section, however, because there was substantial evidence of significant environmental impacts, the court properly ordered the County to prepare an EIR.

## 5. *Substantial Evidence*

An agency must prepare an EIR if the project may have a significant effect on the environment.[25] Therefore, as stated above, we must determine whether the record discloses substantial evidence to support a fair argument that the general plan amendments may have a significant effect on the environment.[26]

The following does not qualify as substantial evidence under CEQA: "argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts that do not contribute to, or are not caused by, physical impacts on the environment."[27] Substantial evidence, instead, consists of "fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact."[28]

The County argues that the cities failed to provide the required evidence in challenging the County's findings. Specifically, the County argues that the letters that were submitted in opposition of the proposed amendments were comprised of argument, speculation, and nonexpert opinion.

While the cities may produce expert opinion evidence, they may also present other evidence of facts and reasonable assumptions from those

---

[23]Public Resources Code section 21003.1; *Sundstrom v. County of Mendocino, supra*, 202 Cal.App.3d at page 307.

[24]*Silveira v. Las Gallinas Valley Sanitary Dist., supra*, 54 Cal.App.4th at page 992; *Gentry v. City of Murrieta, supra*, 36 Cal.App.4th at page 1379.

[25]Public Resources Code section 21100, subdivision (a); *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66].

[26]See *Gentry v. City of Murrieta, supra*, 36 Cal.App.4th at pages 1399-1400.

[27]Public Resources Code section 21080, subdivision (e)(2).

[28]Public Resources Code section 21080, subdivision (e)(1).

facts.[29] There is no requirement therefore that the city produce expert testimony in order to support a fair argument that the project may have a significant effect on the environment.[30]

In its letters to the Board, Rancho Cucamonga discussed the original terms of the County's general plan, the language of the amendments themselves, and the provisions of its general plan to demonstrate the shift in the County's policies regarding territory within a city's sphere of influence. Rancho Cucamonga then drew reasonable inferences from this evidence to present a fair argument that the amendments may produce a significant impact on the environment. In support of its position, Rancho Cucamonga cited the *City of Livermore v. Local Agency Formation Com.*[31]

In the *City of Livermore*, the city sued the Alameda County Local Agency Formation Commission (LAFCO) to require LAFCO to prepare an EIR before adopting its revised sphere of influence guidelines. In characterizing its revision as an incorporation of its existing policies and procedures as they had evolved over the past decade, LAFCO essentially made two changes to the guidelines. First, LAFCO deleted the statement, " 'Existing and future urban development areas belong in cities.' "[32] Second, LAFCO added language that future incorporation of urban development located outside of a city's sphere of influence would be based on the county's, rather than the city's, general plan. In its attempt to comply with CEQA, LAFCO conducted an initial study and, despite the city's objections, adopted a negative declaration. In response to the city's lawsuit, the trial court ordered LAFCO to prepare an EIR to analyze the environmental impact of its revisions.

In affirming the trial court's decision, the appellate court stated that, while the record disclosed substantial evidence of potential environmental impact, the record failed to show any persuasive evidence to the contrary. A planning consultant for the city submitted a report that listed several possible effects on the environment, including "(1) greater consumption of land to accommodate the same level of population and economic activity, (2) deterioration of existing cities, (3) promotion of growth in unincorporated areas to pay obligations underwriting the services provided by a new urban service area, (4) inability of existing cities to meet bond obligations due to the direction of growth away from these cities, (5) increased net travel resulting

---

[29] Public Resources Code section 21080, subdivision (e)(1).

[30] See *Stanislaus Audubon Society, Inc. v. County of Stanislaus* (1995) 33 Cal.App.4th 144, 152-153 [39 Cal.Rptr.2d 54].

[31] *City of Livermore v. Local Agency Formation Com., supra*, 184 Cal.App.3d 531.

[32] *City of Livermore v. Local Agency Formation Com., supra*, 184 Cal.App.3d at page 536.

in greater energy consumption and pollution, (6) loss of open space, and (7) conversion of agricultural land to nonagricultural uses, reducing the availability of land productive for agriculture and the number of scenic areas."[33] Additionally, the administrative record included letters from various entities, including other affected cities.

In an attempt to refute this evidence, LAFCO provided a conclusory resolution concerning its own interpretation of the revisions. LAFCO also attacked the reliability of the planning consultant's report. Based on this weak evidence against a fair argument that the revisions may have a significant effect on the environment, the court concluded that LAFCO's negative declaration must be set aside.[34]

Similarly, in this case, Rancho Cucamonga, Redlands, and every affected city that took a nonneutral position toward the amendments, submitted written objections. Many cities provided lengthy evaluations of the potential effects of the amendments. In its written objection, Rancho Cucamonga argued that the amendments would discourage annexations and promote development in unincorporated areas. In support of its argument, Rancho Cucamonga cited the language of the amended version of the County's general plan. By comparing the County's amended general plan and its own general plan, Rancho Cucamonga pointed to several potential conflicts that, under the County's new policies, may result in development that would not have otherwise been permitted under the County's former general plan.

■ Before considering specific examples, we note that, when the project under environmental review involves amendments or revisions to a general plan, the results of the environmental studies usually will lack the degree of specificity involved in other projects such as a construction project.[35] Therefore, the environmental analysis will focus on expected secondary effects, rather than specific identifiable consequences. [36]

■ In providing an example of such expected secondary effects, Rancho Cucamonga discussed the West Valley Foothills Planning Area policies, which impact territory within Rancho Cucamonga's sphere of influence. Under the County's former general plan, the County was required to "[a]dopt and implement the slope development guidelines of adjoining

---

[33]*City of Livermore v. Local Agency Formation Com., supra*, 184 Cal.App.3d at pages 541-542.

[34]*City of Livermore v. Local Agency Formation Com., supra*, 184 Cal.App.3d at page 542.

[35]*Schaeffer Land Trust v. San Jose City Council* (1989) 215 Cal.App.3d 612, 625 [263 Cal.Rptr. 813].

[36]*Schaeffer Land Trust v. San Jose City Council, supra*, 215 Cal.App.3d at page 625.

communities." As previously stated, the amendments delete this provision. Rancho Cucamonga provided a copy of its own policies concerning slope development. Rancho Cucamonga's general plan and development standards are "designed to minimize grading, preserve natural contours, minimize erosion, maintain open space and protect public safety[,] protect water and biological resources[,] while allowing for limited development in harmony with the environment." Under Rancho Cucamonga's standards, grading of slopes greater than 15 percent is significantly limited and grading of slopes greater than 30 percent is completely prohibited. By contrast, the County permits grading of slopes greater than 30 percent with certain limitations. Based on these facts, Rancho Cucamonga reasonably inferred that the deletion of the provision requiring the County to adopt its standards would allow for an increase in grading, thereby destroying the natural contours of hillsides and possibly eliminating the natural habitat of certain plants and animals.

Rancho Cucamonga also pointed to the amendments dealing with standards for the density of development. The amendments eliminate language requiring the County to implement the cities' growth control limits and development standards. The amendments also eliminate the conditional use permit requirement for certain development. Based on the revised language, the County is required only to take the cities' standards into consideration in exercising its discretion to apply its own standards. Under its general plan, Rancho Cucamonga requires five acres of park for every 1,000 inhabitants. The County, on the other hand, requires three acres of park for every 1,000 inhabitants. Rancho Cucamonga also notes that, unlike the County, it calculates the permitted density of development in net acreage, thereby excluding existing parks and open spaces. As stated by Rancho Cucamonga, it is reasonable to assume that such development would reduce the amount of open space as well as adversely impact traffic and air quality.

In a letter submitted by counsel for several of the affected cities, including Rancho Cucamonga and Redlands, counsel noted the inadequacies of the County's proposed negative declaration. In particular, counsel referred to the amendments dealing with public utilities and services. Under the previous version of the County's general plan, a developer was required, with limited exceptions, to locate service connections for its projects within a mile away from sewer main lines. The amended version makes this condition discretionary. Under the amendments, rather than supporting annexation based on certain factors, including the city's ability and commitment to provide services, the County simply must review and consider a city's request for annexation. As to the policies dealing specifically with the east Loma Linda

and west Redlands sphere of influence areas, the County eliminated two provisions mandating that new development comply with the city's service requirements and obtain the necessary service commitments prior to approval. As noted by Redlands, these amendments may lead to conflicts in coordinating services to the areas within a city's sphere of influence.

The above examples provide a sample of the expected secondary consequences to the County's adoption of the amendments. Based on the drastic changes to the County's general plan, reasonable assumptions of environmental impact may be discerned simply from the language of the amendments themselves. Nevertheless, in referring to differences in policies before and after the amendments, the cities have presented substantial evidence of a fair argument that the amendments may have a significant effect on the environment.

Moreover, the County admitted that the amendments may cause an increase in development under the County's jurisdiction without annexation. The County also acknowledged "a history of conflict with the cities of Redlands and Rancho Cucamonga over the concept of allowing development in unincorporated sphere of influence areas, and over the application of city development standards or growth control measures." Although the County would argue that the amendments simply clarify its interpretation of the language in the pre-amended version of its general plan, the County fails to cite any substantial evidence in support of its argument.

Ironically, the County complains concerning the cities' lack of evidence, when it initially set the stage by failing to gather facts and evidence in conducting its initial study of the amendments' potential environmental effects. The County's conclusory evaluation of the amendments fail to support its decision to adopt a negative declaration.

Rather, there is substantial evidence of a fair argument for potential significant environmental impact. Accordingly, we conclude that the trial court properly ordered the County to comply with CEQA by preparing an EIR.

### 6. *Overbroad*

Under Public Resources Code section 21168.9, upon a finding of the agency's noncompliance with CEQA, the court must enter an order

mandating that the agency set aside its decision and take any necessary action to achieve compliance.[37]

In exercising its authority under this provision, the trial court commanded the County "not to readopt General Plan Amendment GPA/CW1-849N, or any similar amendment(s) to the County's General Plan concerning planning, land use and annexation policies that affect the areas of the County that are within the spheres of influence of any incorporated city in the County without first preparing and considering an [EIR] and fully complying with [CEQA]."

The County claims this language is overbroad, vague, ambiguous, and invalid under common law, constitutional law, and statutory law. None of the County's claims have merit.

In its first argument, the County contends that the language is overbroad because it extends beyond the scope of the litigation. Although the County cites various cases dealing specifically with injunctions that infringe upon constitutionally protected activity, we agree with the County that an injunctive order should be limited in scope to the subject of the litigation.[38] We disagree, however, with the County's argument that the court's order prohibiting the adoption of "similar amendments" extended beyond the scope of the litigation. Rather, the court reasonably included this additional requirement to prevent the County from attempting technical compliance with the court's order (i.e., by simply enacting new amendments with similar language), without remedying the deficiencies raised in this action (i.e., the County's failure to comply with CEQA before enacting the amendments).

In challenging the injunction on the grounds of vagueness and ambiguity, the County argues that the language would leave a person of common intelligence guessing as to the court's meaning of a "similar amendment." Generally, "an injunction must not be uncertain or ambiguous and the defendant must be able to determine from the order what he may and may not do. However, in determining whether the defendant has been given

---

[37]Public Resources Code section 21168.9, subdivision (a)(1) and (3).

[38]*Watsonville Canning & Frozen Food Co. v. Superior Court* (1986) 178 Cal.App.3d 1242, 1248 [224 Cal.Rptr. 303]; see *Endangered Habitats League, Inc. v. State Water Resources Control Bd.* (1997) 63 Cal.App.4th 227, 244 [73 Cal.Rptr.2d 388].

sufficient notice of the conduct proscribed or compelled, the language of the injunction must be interpreted in light of the record which discloses the kind of conduct that is sought to be enjoined."[39] ▮▮▮ When interpreted in light of the record, the court's order clearly indicates that the County is prohibited from making substantive changes to its land use and development standards without complying with CEQA. Again, as stated above, the court's order is reasonably tailored to prevent the County from circumventing the court's ruling by simply enacting similar amendments and avoiding the requirements of CEQA.

The County next argues that the court's order constituted an impermissible "obey the law" injunction. We disagree. While a court may not issue a broad injunction to simply obey the law, thereby subjecting a person to contempt proceedings for committing at any time in the future some new violation unrelated to the original allegations, the court is entitled to restrain the person from committing similar or related unlawful activity.[40] That is exactly what the court did here.

The County contends that the court's injunction encroaches upon the County's constitutional and statutory authority to legislate in the area of land use and development. This contention also lacks merit. The County's authority is only limited insofar as it attempts to adopt similar, not minor or insignificant, changes to its general plan without complying with the state's environmental protection laws.

In its final argument, the County argues that the court violated Public Resources Code section 21168.9, subdivision (b), which provides that the court's order must include only those mandates that are necessary to achieve CEQA compliance.[41] For the reasons stated above, we conclude that the court properly exercised its authority under section 21168.9 in prohibiting the County from engaging in the same or similar unlawful activity.

Therefore, we conclude the court did not exceed its jurisdiction in including this additional requirement in its writ of mandate.

---

[39]*People v. Wheeler* (1973) 30 Cal.App.3d 282, 296 [106 Cal.Rptr. 260], citing *Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 534 [67 Cal.Rptr. 761, 439 P.2d 889].

[40]See *National Labor Relations Board v. Express Pub. Co.* (1941) 312 U.S. 426, 435-437 [61 S.Ct. 693, 699-700, 85 L.Ed. 930].

[41]Public Resources Code section 21168.9, subdivision (b).

## 7. *Disposition*

We affirm the trial court's judgment. Rancho Cucamonga and Redlands shall recover their costs on appeal.

Ramirez, P. J., and Hollenhorst, J., concurred.

On February 22, 2002, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied May 15, 2002.